IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | CRIMINAL NO. 11-00103-CB |
| VICTOR MANUEL MANTA-CARILLO, | ) | |
| Defendant. | ) | |

## ORDER

On July 26, 2011, this matter came before the Court for a hearing on Defendant's motions to suppress evidence (Doc. 16) and statements (Doc. 18). After considering the evidence and arguments presented at the hearing as well as the various briefs filed by the parties, the Court finds that the motions are due to be denied for the reasons set forth below.

*Facts*

On February 24, 2011, United States Customs and Border Patrol (CPB) officers conducted a routine inspection of the M/V Pera, a foreign vessel that had arrived at the Alabama State Docks from a foreign port. Defendant Victor Manuel Manta-Carillo, a foreign citizen, was the vessel's captain. CPB inspects hundreds of ships each month at the Alabama State Docks. This inspection was carried out by members of the CBP's Anti-Terrorism and Contraband Enforcement Team (A-TCET). A-TCET officers inspect the documentation of a vessel's crew members and also inspect the vessel. An inspection involves a search of the all areas of the vessel, including the crew members' living quarters. CPB officers, working in teams of two, methodically search the ship room-by-room looking for drugs, terrorism-related items or

contraband of any kind. Crew members are not free to leave the vessel until the inspection is completed. In fact, except for the crew member who keeps watch over the gang plank and the crew member required to accompany the CPB officers, the entire crew remains assembled in one room, typically the galley, during the inspection.

When CPB officers inspected Manta-Carillo's quarters, they noticed DVD's out in plain view. Some of these appeared to be "adult entertainment" or adult pornography. One DVD entitled "Animal Passion" had several depictions of beastiality on its cover. Upon finding this particular DVD, which he believed to be contraband, Officer Gary King contacted his supervisor and another officer. CBP contacted Special Agent Chalkwin and Special Agent Anderson of Immigration and Customs Enforcement (ICE),[1] who came to investigate further. Officer King and Agent Anderson went back on board to the captain's quarters. They played a portion of the DVD to confirm that it contained images of beastiality.

Agent Anderson then interviewed the Manta-Carillo and began by asking what languages he spoke.[2] Manta-Carillo replied that he spoke both Spanish and English. Anderson conducted the interview in English. When asked about the DVD, Manta-Carillo stated that it was not his and that he had been keeping it in his quarters so that the crew would not have access to it. When informed that there might be a problem with the DVD, Manta-Carillo began telling the agents that child pornography would be found in his room. At this point, Agent Anderson did not ask any questions. Instead, he called a Spanish-speaking agent, Special Agent Pena, and had him speak with Manta-Carillo in Spanish over the telephone to be sure that Manta-Carillo

---

[1] According to testimony at the hearing, ICE is now Homeland Security Investigations (HSI). In this order the acronym, ICE, will be used.

[2] The interview took began in a room across the hall from the captain's quarters and subsequently moved to the captain's quarters.

2

was saying what Anderson thought he was saying. After confirming that there was no mistake about what Manta-Carillo said or meant, Agent Anderson questioned him further. Manta-Carillo said that he downloaded child pornography onto his laptop computer and then saved it to his external hard-drive. Agent Anderson wrote down Manta-Carillo's statement. Meanwhile, a Spanish-speaking agent, Special Agent Jose Bayonne, arrived at the vessel. Agent Bayonne read the statement to Manta-Carillo in Spanish so that there would be no misunderstanding. Anderson testified that Manta-Carillo "absolutely" was conversant in English[3] and that he brought Agent Bayonne in to read the statement in Spanish out of an abundance of caution because of the serious nature of this matter.

The interview lasted about an hour and a half. At no time did Agent Anderson (or anyone else) give *Miranda* warnings to Manta-Carillo. There were a number of agents in and out during the interview, and as many as six agents may have been in the cabin at one time. These agents did not exhibit weapons, bar the Defendant's exit, or threaten detention in any way. Manta-Carillo was never handcuffed or physically restrained, and he was allowed to leave with his vessel when it departed from Mobile.[4] Agent Anderson considered the interview to be consensual. Manta-Carillo was not told that he could not leave during the interview, though about 75 percent of the way through, Agent Anderson did say Manta-Carillo would be free to move about the vessel once the interview was concluded. As noted, no one is allowed to leave

---

[3] Agent Anderson's testimony regarding the Defendant's ability to speak and understand English was undisputed. Anderson testified that occasionally he would have to stop and explain something differently so that Manta-Carillo could understand. Once he understood, the interview would continue.

[4] Due to technical difficulties, the agents could not gain access to any of the computer files. Therefore, they seized the laptop and the external hard-drive and later obtained a search warrant to search its contents. Manta-Carillo was arrested when his vessel returned to Mobile on a later voyage.

the vessel, or even move around freely on board, during an inspection. Moreover, Manta-Carillo could not have left the vessel under any circumstances due to his visa status.[5]

*Issues Presented*

Defendant seeks to suppress "all evidence seized from his person and his captain's cabin aboard vessel *Pera*" and "statements he allegedly made to U.S. Border Patrol and Homeland Security agents." (Mots. to Suppress, Docs. 16 & 18.) Defendant argues that the warrantless search of his cabin without consent violated the Fourth Amendment guarantee of freedom from unreasonable searches.[6] Defendant contends that his statements are due to be suppressed both because agents failed to advise him of his rights against self-incrimination as set forth in *Miranda v. Arizona*, 384 U.S. 436 (1966), and because the statements were not knowing and voluntary due to his limited command of the English language. In response, the government asserts that the search of the captain's quarters was a permissible border search and therefore did not violate the Fourth Amendment. With respect to Defendant's statements, the government contends, first, that *Miranda* warnings were not required because the Defendant was not in custody and, second, that the evidence demonstrates the statements were knowing and voluntary.

*Legal Analysis*

    *Fourth Amendment/Warrantless Search*

This case involves something rarely encountered in this Court, a challenge to a border search conducted pursuant to the customs authority of the United States. "Searches conducted at

---

[5] Officer King testified that only crew members with the proper visa may disembark from the ship when it is in port. Manta-Carillo had a passport but no visa; therefore, he was not permitted to leave the vessel.

[6] Alternatively, Defendant argues that the evidence should be suppressed as "fruit of the poisonous tree" because the search was the result of a statement obtained in violation of the Fifth Amendment.

4

the border are analyzed in two steps. The first step is to determine if the search was authorized by statute, and, if so, the second step is to decide if the search was reasonable under the Fourth Amendment." *United States v. Alfaro-Moncada,* 607 F.3d 720, 726 (11th Cir. 2010). Defendant does not dispute CBP and ICE acted pursuant to authority conferred by the customs statutes,[7] specifically, 19 U.S.C. §1581. That section provides that "[a]ny officer of the customs may at any time go on board of any vessel. . . at any place in the United States or within the customs waters, . . . and examine the manifest and other documents and papers and examine, inspect and search the vessel . . . and every part thereof and any person, trunk package or cargo on board." *Id.*

Having determined that the search was permitted by statute, the Court must consider its reasonableness under the Fourth Amendment. Reasonableness is expansively defined in the border search context.

> That searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border, should, by now, require no extended demonstration. The Congress which proposed the Bill of Rights, including the Fourth Amendment, to the state legislatures on September 25, 1789, 1 Stat. 97, had, some two months prior to that proposal, enacted the first customs statute, Act of July 31, 1789, c. 5, 1 Stat. 29. Section 24 of this statute granted customs officials "full power and authority" to enter and search "any ship or vessel, in which they shall have reason to suspect any goods, wares or merchandise subject to duty shall be concealed . . .." This acknowledgement of plenary customs power was differentiated from the more limited power to enter and search "any particular dwelling-house, store, building, or other place . . ." where a warrant upon "cause to suspect" was required. The

---

[7] Nor does Defendant dispute that the search of a vessel entering a United States port from international waters is a border search. *See United States v. Moreno*, 778 F.2d 719, 721 (11th Cir.1985) (where a ship first docks after arriving from a foreign country is the functional equivalent of the border).

5

> historical importance of the enactment of this customs statute by the same Congress which proposed the Fourth Amendment is, we think, manifest.

*United States v. Ramsey*, 431 U.S. 606, 616-17 (1977) (footnote omitted).

In fact, the Eleventh Circuit recently upheld a border search under nearly identical circumstances. *Alfaro-Moncada* involved an inspection for agriculture contraband conducted by the CBP. The bow-to-stern inspection included a search of the crew's living quarters. While searching Alfaro-Moncada's desk drawers, CBP officers found DVD's containing child pornography. Though the Eleventh Circuit recognized that a crew member's cabin is his home, and a person's home is entitled to the greatest protection under the Fourth Amendment, it nevertheless found the search to be reasonable. First, the court noted that, unlike a home in a fixed location, a crew member's home on board a ship can be used to smuggle contraband. "Given the dangers we face, the paramount national interest in conducting border searches to protect this nation and its people makes it unreasonable to require any level of suspicion to search any part of a foreign cargo vessel coming into this country. Crew members' cabins are no exception because, like any other part of a vessel, they can be used to smuggle in weapons of mass destruction, illegal devices, or other contraband." *Id.* at 731. Thus, it is clear that the warrantless search of Manta-Carillo's cabin did not violate the Fourth Amendment prohibition on unreasonable searches.

### *Fifth Amendment/Miranda*

Whether *Miranda* warnings are necessary at border interrogations also has been addressed by the Eleventh Circuit. In *United States v. Moya*, 74 F.3d 1117 (11th Cir. 1996), the court recognized that "aliens at the border are entitled to *Miranda* warnings before *custodial* interrogation." *Id.* at 1119 (emphasis added). A defendant is "in custody" for *Miranda* purposes

if a reasonable person in his position would have felt his freedom of movement restrained to the extent that he would not feel free to leave. *Id.* More specifically, the custody requirement involves restrictions "'of the degree associated with formal arrest.'" *Id.* (quoting *Minnesota v. Murphy*, 465 U.S. 420, 430 (1984)(citations omitted)). This is an objective test, based on the totality of the circumstances. *Id.* Moreover, "whether [border] interrogation is custodial should be interpreted in light of the strong governmental interest in controlling the borders." *Id.* Finally, "questioning at the border must rise to a distinctly accusatory level before it can be said that a reasonable person would feel restraints on his ability to roam to the degree associated with formal arrest." *Id.* Among the factors to consider are whether the defendant was physically restrained, whether any formal accusations were made, whether the defendant was told he could not leave, whether the defendant asked to leave, and whether the defendant made admissions that would have led a reasonable person to expect he would be arrested immediately. *Id.*; *see also United States v. McDowell*, 250 F.3d 1354, 1362-63 (11th Cir. 2001).

Because the circumstances surrounding Manta-Carillo's statements do not rise to the level of custodial interrogation, no *Miranda* warnings were necessary. The Defendant was not physically restrained.[8] He was not placed under arrest before, during or after the interview. In fact, he was subsequently allowed to leave the country with his vessel. He was never threatened with arrest. Based on the testimony at the suppression hearing, the only remotely accusatory statement made during the interview was that there "might be a problem" regarding the initial DVD. Manta-Carillo never asked to leave the interview. Agent Anderson did not tell the

---

[8] Defendant asserts that interview was custodial based on the number of agents (as many as six) in the room during the interview. But there is no evidence that the agents acted in any way to intimidate, restrain or prevent him from leaving. A reasonable person would not consider himself restrained merely because a number of agents came and went during the interview.

Defendant he could not leave but did say he would be free to leave when the interview was over. Though there were obvious restrictions on Defendant's freedom of movement—he could not leave the ship because of his visa status and freedom of movement around the ship was restricted during the inspection—those were unrelated to the interview and could not have lead a reasonable person to believe he was in custody. In sum, the Defendant's statements were not obtained in violation of the Fifth Amendment's right against self-incrimination.

### *Fifth Amendment/Knowing & Voluntary Statement*

"An accused is deprived of due process if his conviction rests wholly or partially upon an involuntary confession, even if the statement is true, and even if there is ample independent evidence of guilt." *United States v. Davidson* 768 F.2d 1266, 1269 (11th Cir. 1985). When a defendant asserts that his confession was not voluntary, the trial court has a duty to determine, outside the presence of the jury, it was freely and voluntarily given before the confession may be admitted into evidence at trial. *Jackson v. Denno*, 378 U.S. 368, 376 (1964); 18 U.S.C. § 3501. The primary focus of the voluntariness inquiry is whether there has been police overreaching. *United States v. Bernal-Benitez*, 594 F.3d 1303, 1319 (11th Cir. 2010). The Court looks to the totality of the circumstances to determine whether a confession was voluntary, "including the details of the interrogation and the defendant's characteristics." *Id.* Ultimately, the question is whether the defendant "made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him." *United States v. Rouco*, 765 F.2d 983, 993 (11th Cir. 1985) (citation and quotations omitted). Among factors to consider are the Defendant's education and intelligence, length of detention, length of questioning, the use of coercive interrogation techniques and whether Defendant was advised of his constitutional rights. *Id*.

Manta-Carillo asserts that his statements were not voluntary because he was questioned in English and did not have sufficient command of the language. A language barrier alone does not render a confession involuntary. In *Bernal-Benitez*, 594 F.3d at 1319-20, defendant Villafuerte, who spoke only Spanish, argued that his confession was involuntary because it was written in English and orally translated to him by an agent before he signed it. The appellate court found it "unusual to have a suspect sign a statement written in a language he cannot read." *Id.* at 1319. Nevertheless, the statement was deemed admissible because there was no evidence of police overreaching. *Id.* In this case, Manta-Carillo has pointed to nothing other than the language issue to suggest that his statements were involuntary, and even that argument is weak. Agent Anderson testified, credibly and without dispute, that Manta-Carillo understood and was conversant in English. Out of an abundance of caution, Anderson obtained help from Spanish-speaking agents twice during the course of the interview. When Manta-Carillo stated, practically out of the blue, that they would find child pornography in his quarters, Anderson had a Spanish-speaking agent clarify, that Manta-Carillo did say what Anderson had heard. Furthermore, the entire written statement was orally translated into Spanish for the Defendant. In sum, after viewing all the circumstances surrounding Manta-Carillo's statements, the Court is satisfied that those statements were made knowingly and voluntarily.

*Conclusion*

The search of the Defendant's quarters on board the *M/V Pera* was a border search authorized by statute and was reasonable within the meaning of the Fourth Amendment. Consequently, suppression of the evidence seized in that search is not required. Defendant's

statements were knowing, voluntary and noncustodial.  Those statements are admissible.  It is, therefore, **ORDERED** that the motions to suppress be and hereby are **DENIED**.

    **DONE** and **ORDERED** this the 28th day of July, 2011.

    <u>s/*Charles R. Butler, Jr.*</u>
**Senior United States District Judge**